MCM:NR
F.#2018R00509

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF NEW YORK

IN THE MATTER OF THE SEARCH OF
(1) A SILVER SAMSUNG CELLULAR
TELEPHONE ASSIGNED TELEPHONE
NUMBER (917) 651-5016 AND (2) A GREY
AND BLACK SAMSUNG MODEL S8
CELLULAR TELEPHONE, WITH IMEI
#358331082177459, ASSIGNED
TELEPHONE NUMBER (718) 312-9358 (the
"SUBJECT TELEPHONES") CURRENTLY
LOCATED IN BROOKLYN, NEW YORK

APPLICATION FOR A SEARCH
WARRANT FOR ELECTRONIC DEVICES

Case No. 18-M-616

## AFFIDAVIT IN SUPPORT OF AN APPLICATION UNDER RULE 41 FOR WARRANTS TO SEARCH AND SEIZE

I, NICHOLAS SWANSON, being first duly sworn, hereby depose and state as follows:

## INTRODUCTION AND AGENT BACKGROUND

1.     I make this affidavit in support of an application under Rule 41 of the Federal

Rules of Criminal Procedure for a search warrant authorizing the examination of property—two

electronic devices—which is currently in law enforcement possession, and the extraction from

that property of electronically stored information described in Attachment B.

2.     I am a Special Agent with the Federal Bureau of Investigation ("FBI") and have

been since 2015.  Prior to serving as a FBI Special Agent, I worked as a police officer in

Burbank, Illinois.  In connection with work with the FBI, I have conducted numerous

investigations relating to, among other things, fraud, money laundering and extortion.  In

connection with those investigations, I have interviewed witnesses, reviewed subpoenaed materials and obtained and reviewed electronic evidence, including evidence obtained from mobile telephones.

3.     This affidavit is intended to show only that there is sufficient probable cause for the requested warrant and does not set forth all of my knowledge about this matter.

## **IDENTIFICATION OF THE DEVICE TO BE EXAMINED**

4.     The property to be searched is a (1) a silver Samsung cellular telephone, assigned telephone number (917) 651-5016 (the "Tepfer Telephone"); (2) a grey and black Samsung model S8 cellular telephone, with IMEI #358331082177459, assigned telephone number (718) 312-9358 (the "Haimoff Telephone") (together "SUBJECT TELEPHONES").  The SUBJECT TELEPHONES are currently in the possession of the undersigned in the Eastern District of New York.

5.     Igal Haimoff ("Haimoff") was arrested on June 18, 2018 at his residence in Queens, New York.[1]  At the time of his arrest, Haimoff was advised of his Miranda rights, acknowledged that he understood them and agreed to speak with law enforcement agents.  While answering the law enforcement agents' questions, Haimoff identified the Haimoff Telephone as his own and permitted agents to review certain text messages between himself and Andrew Tepfer that were stored on the Haimoff Telephone.  At that time, agents took "screen shots" of

---

[1]     Haimoff and co-conspirator named Mark Weissman were arrested on a complaint in relation to the extortion scheme described herein on June 18, 2018.  (18-M-548).

certain text messages between Haimoff and Andrew Tepfer.  Later that day, immediately prior to Haimoff's appearance to be arraigned on the complaint in his matter, Haimoff's counsel informed the government that Haimoff was withdrawing this consent.  Accordingly, the government has not conducted any subsequent search of the Haimoff Telephone.

6.      Andrew Tepfer ("Tepfer") was arrested on June 18, 2018 in a bedroom located in the basement of a single-family home in Queens, New York.[2]  Law enforcement agents inquired with the homeowner as to Tepfer's location and the homeowner directed the agents to Tepfer's bedroom in the basement of the residence.  When agents opened the door, they encountered Tepfer in a small bedroom containing a single twin bed.  Agents observed the Tepfer Telephone in plain view on the bed, approximately two or three feet from Tepfer.  Agents did not observe any other telephones in the room, nor did they observe any indicia that any other individual was occupying the room.

7.      The applied-for warrant would authorize the forensic examination of the SUBJECT DEVICES for the purpose of identifying electronically stored data particularly described in Attachment B.

## PROBABLE CAUSE

8.      In or about 2010, an individual who became the target of Tepfer, Haimoff and Mark Weissman's extortion plan (hereinafter "the Victim") pleaded guilty in a federal

---

[2] Andrew Tepfer was arrested on a complaint in relation to the extortionate scheme described herein.  (18-M-552).

3

criminal case pending in the Eastern District of New York (the "EDNY Case"), to conspiracy to commit securities fraud, securities fraud and conspiracy to commit money laundering.

9.      In or about February 2015, the Court entered an order directing the Victim to pay restitution to victims of the fraud charged in the EDNY Case in the amount of approximately $12.7 million (the "Restitution Judgment").

10.     In or about 2012, Tepfer pleaded guilty to conspiracy to commit securities fraud, securities fraud and conspiracy to commit money laundering.

11.     In or about February 2015, the Court entered an order directing Tepfer to pay the Restitution Judgment, for which Tepfer was jointly and severally liable with the Victim.

12.     As of July 1, 2018, more than $12,000,000 of the Restitution Judgment that Tepfer and the Victim were ordered to pay remains outstanding.

13.     On or about February 23, 2017, Mark Weissman ("Weissman") approached the Victim.[3] Weissman informed the Victim, in sum, substance and in part, that Tepfer wanted $1,000,000 from the Victim or else Tepfer would get the Victim in trouble. Weissman did not specify the precise nature of any such trouble.

14.     In a text message sent to the Victim on or about February 27, 2017,[4] Weissman confirmed that when he had delivered the message to the Victim on February 23, 2017, he was acting on behalf of Tepfer.

---

[3]     The Victim reported this approach to an agent from the FBI on or about February 27, 2017.

[4]     At all times identified herein beginning on February 27, 2017, the Victim was acting with the knowledge of and at the direction of law enforcement agents.  Text messages

15.    On or about March 2, 2017, the Victim met with Weissman at a meeting that was consensually recorded.[5]  In that meeting, Weissman confirmed that the Victim did not "owe him [Tepfer] anything."  Nonetheless, Weissman noted that Tepfer had informed Weissman that "[Tepfer] has information and he's going to go to the authorities and let them know."  Weissman and the Victim then had the following exchange:

> Victim:    So basically, you are saying that he wants to go to the DA or the thing, unless we come up with some sort of arrangement.
>
> MW:        Yeah.
>
>            . . .
>
> Victim:    But, basically, what you are saying is, he came to you and said he's going to the DA.
>
> MW:        Yes, yes, yes. And the only reason he hasn't done it until now is because I told him not to.

16.    Shortly after the March 2, 2017 meeting, the Victim and Mark Weissman exchanged the following text messages:

> MW:        Spoke with Avi. You were right
>
> Victim:    Right about what [?] He wants a million [?]

---

referenced herein were obtained by the government in the following manners.  First, the Victim consensually provided copies of relevant communications to the FBI.  Second, as noted above, subsequent to his arrest, Haimoff allowed agents to take screenshots of certain text messages between himself and Andrew Tepfer.  Third, Mark Weissman, incident to his arrest, consented to a search of his telephone and allowed agents to take screenshots of certain messages between himself and Andrew Tepfer.

[5]    All transcripts of consensually recorded meetings or telephone calls set forth herein are in draft form.

> MW:       At least
>
> Victim:   Get a number[.] And how I get it to Avi that's it
>
> MW:       Okay. I will try my best.

17.    On or about and between March 5 and March 7, 2017, the Victim and Mark

Weissman exchanged the following text messages:

> Victim:   Just text me what Avi wants not to go to DA and
>           Doj final numbers. I can't talk now I'm with
>           people I want this finished. Or next Thursday we
>           all meet and he will tell me what he wants.
>
> MW:       Over 5 million.

Based on my training and experience and my knowledge of the investigation, I believe that

these text messages in early March 2017 relate to Tepfer's attempt to extort funds from the

Victim based on a threat that Tepfer will provided derogatory information to law

enforcement officials about the Victim if the Victim does not pay the requested funds. ("Just

text me what Avi wants not to go to DA and Doj final numbers").  Further I believe the

reference to a "million" and "5 million" are references to the extortionate amounts that

Tepfer was seeking from the Victim.

18.    In or about July 2017, the Victim communicated with another individual

("John Doe"), who confirmed that Tepfer was seeking millions of dollars to "leave [the

Victim] alone."  More specifically, John Doe met with the Victim on or about July 25, 2017.

Toll records reflect that the Tepfer Telephone and a telephone belonging to Weissman (the "Weissman Telephone") were in contact three times on July 25, 2017. [6]

19.    On or about December 21, 2017, Tepfer inadvertently sent a text message to his supervising United States Probation Officer from the Tepfer Telephone.   The text message stated, in part, "$6 million!   You can do it!"   Tepfer then sent the following message to his Probation Officer "Sorry total mistake."   Based on my training and experience and the investigation to date, I believe this text message reflects Tepfer erroneously sending a text message to his Probation Officer that included the amount ($6 million) that he hoped to extort from the Victim.

20.    On or about and between March 5 and March 16, 2018, the Victim and Weissman exchanged a series of text messages.  In those communications, Weissman informed the Victim, in sum, substance and in part, that Tepfer was reaching out to various rabbis in Queens, New York and that most of those rabbis had indicated they did not wish to be involved in transferring the money.  Weissman further indicated that Tepfer had located one rabbi who might be prepared to assist with the transfer of the funds.

21.    On or about March 20, 2018, the Victim and Weissman met at a location in Queens, New York.  A consensual audio and video recording of the meeting was made. During the meeting, the Victim and Weissman had the following exchange:

> Victim:    We all know that we got to do something that, you know, because otherwise he's going to keep bothering me and harassing me and --

---

[6]    All toll records referenced herein were obtained pursuant to grand jury subpoena.

MW:        I understand, yeah.

Victim:    -- blackmailing me or whatever he's doing.

MW:        Right.

During the same meeting, the Victim, acting at the direction of law enforcement, proposed paying Tepfer $50,000 per month for ten years, for a total of $6,000,000. Weissman indicated that he expected that the charity through which the funds would pass would take a 10% fee, stating "ten percent which is what the charities typically take."

22.   The Victim also stated, during the same meeting, in sum, substance and in part, that he would expect Tepfer to provide any incriminating papers to the rabbi who would serve as an intermediary and that, at the end of the ten-year period, the rabbi would destroy the documents or give them to the Victim. The Victim further informed Weissman that monthly payments would be preferable to a large lump sum payment, because "it's going to be hard to bring $3 million at one time into the country without alerting the FBI." Weissman informed the Victim that Tepfer could not receive money in Tepfer's name. Weissman further noted that Tepfer wanted to buy a house but that "he's not going to be able to buy it in his name" and that "we can't deposit that money . . . is he not allowed to have money, I mean, if he gets $50,000 in his bank account, or $20,000, you know, doesn't he have to pay reparations? He has millions of dollars in reparations."[7] Weissman further explained that

---

[7]    Based on my communications with the Victim and my knowledge of the investigation to date, I believe Weissman is using the word "reparations" to refer to the restitution that Andrew Tepfer owes in connection with the Restitution Judgment.

Tepfer was "going to want like a million upfront" followed by some smaller payments over time and the Victim again cautioned that documentation would be required for such a large transfer because "the FBI would be alerted." Weissman informed the Victim that he would present the proposal to Tepfer and described the proposal as "reasonable." Based on my training and experience and the investigation to date, I believe that Weissman and the Victim were discussing the amount and manner in which the extortionate funds would be paid and the fact that the money could not be placed in Tepfer's name or else it would subject to seizure to satisfy the Restitution Judgment. ("we can't deposit the money … is he not allowed to have money, if he gets $50,000 in his bank account, or $20,000, you know, doesn't he have to pay reparations? He has millions of dollars in reparations.") I further believe that structuring the payments of funds so that they were not directly traceable to Tepfer was designed to enable Tepfer to receive the benefit of the extorted funds while avoiding his obligation to pay the Court-ordered Restitution Judgment.

23.     On March 21, 2018, toll records reflect a call between the Weissman Telephone and the Tepfer Telephone.

24.     On or about March 22, 2018, Weissman sent a text message to the Victim, stating "I spoke with Avi. He does not want a payout over time."

25.   On or about March 23, 2018, Weissman and the Victim exchanged the

following text messages:

> Victim:        ok so How much? How we doing the larger
>                amount? How we doing the paperwork??? . . .
>
> MW:            Will get back to you on Sunday.

Based on my training and experience and the investigation to date, I believe the March 22

and 23, 2018 text message exchanges related to the amount and manner of payment for the

extortionate funds that Tepfer was seeking.

26.   On or about April 19, 2018, the Victim and Weissman met at a location in

Queens, New York. A consensual audio and video recording of the meeting was made. At

the meeting, Weissman discussed, in sum, substance and in part, transferring the Victim's

money through a Switzerland-based associate of a family member of Andrew Tepfer.

Weissman and the Victim had the following exchange:

> MW:            My question to you is like this: he [Tepfer's
>                family member] wanted to know, where this
>                money is going to come from. Because he has
>                sources in different places ... in other words, he
>                could potentially -- if the money is coming from
>                Switzerland, for example, he has people in
>                Switzerland that -- once you transfer something
>                internationally from Switzerland to the United
>                States or to Israel, it becomes a whole big to do
>                and it's complicated.
>
> Victim:        Alright, that's why I told you, it has be under fifty
>                grand.
>
>                . . . .
>
> Victim:        Alright, so what's his plan?

MW:      So, I guess, he [Tepfer's family member] has someone in Switzerland, if, in fact, that's where the money is, who can get the money deposited into their account. They want to set up some kind of trust for Avi.

. . .

MW:      Okay. So it is Switzerland. Um, and I'm not sure whether it's a charity or trust, or whatever, I said, that is up to you, whatever you guys do. So, yeah, if you can send me that information and then the only question is the numbers. Uh, Avi is, um, stuck at, like the last time I spoke with him, at $6 million. Quite a bit of money. So you tell me what you're prepared to offer. And he said, you know, we'll do it in front of a rabbi, so he knows, that you, he's not going to come back to you and bother you in the future.

Victim:  So who's going to hold the papers?

MW:      What papers?

Victim:  These papers that he has.

MW:      The rabbi. [. . . ]

Victim:  Right, so, you send me this email with the, whatever it's going to be. I'll give you, I'll text you the guy's email. You have the lawyer, write everything up, the agreement, and this rabbi is going to hold the papers, and he'll destroy them, right?

. . .

Victim:  And he'll [the rabbi] confirm that he destroyed everything?

MW:      I'm sure he will.

. . .

11

| | |
|---|---|
| Victim: | My father says just pay him and get rid of him. My wife says, walk away and don't let him bother you. |
| MW: | Just walk away? That's not the best solution either. |
| Victim: | Why isn't it the best solution? |
| MW: | To walk away? I don't know what he has on you. I don't know. He claims he has something. I don't know. |
| Victim: | Alright so, I won't walk way. |
| MW: | But, what, how much money are we talking about, here? He'd like a lump sum, finish, one shot deal. |
| Victim: | Will he settle for $5 million or -- |
| MW: | Would he -- |
| Victim: | Okay, let's get this -- I don't want to drag this on anymore. He wants six million? |
| MW: | Uh-hm. |
| Victim: | Alright. |

Subsequently in the conversation, Weissman inquired about the Victim's ability to access the Victim's funds and asked whether the Victim was still on "probation."

27.   As part of the same conversation on April 19, 2018, Mark Weissman and the Victim had the following exchange:

| | |
|---|---|
| MW: | So what, what are we doing? You're going to give me an email? |
| Victim: | I'm going to send you an email. You send this, the whatever, you make up this big contract or whatever to transfer the money to whatever other accounts he has. And uh we're all set. |

12

...

Victim:     Alright, so, I'll send you the email today. How
            long is it going to take you?

MW:         I don't know, I mean, you know. When we settle
            our personal injury cases. It's a lot different. We
            have to send a release. And there has to be some
            sort of release document where he releases you
            from any claims that he might have against you,
            okay? In consideration --

Victim:     That's all phony baloney, that not --

MW:         - but that's the way we are structuring it. We're
            structuring it as a settlement for personal injuries.
            I mean, that's the way we have to structure it. We
            can't structure it the way Avi wanted to structure
            it. That's not -- not the way to do it.

Victim:     Alright. So. You get all the documents. You sent
            it to this guy.

MW:         This is the guy in Switzerland.

Subsequently in the same conversation, Weissman and the Victim discussed John Doe. The

Victim noted that John Doe "doesn't want to be part of the whole thing." Weissman

responded "I don't blame him, I don't want to be a part of [it]." When the Victim noted that

John Doe did not "want to be involved with the blackmail," Weissman responded with

laughter.   Based on my training and experience and the investigation to date, I understand

that Weissman and the Victim were continuing to discuss the amount and manner in which

the extortionate funds that Tepfer was seeking would be paid.

28.     On or about April 19, 2018, the Victim, acting at the direction of the FBI,

provided Mark Weissman with the name of an associate who was ostensibly located in

Switzerland and able to assist with the transfer of funds. In fact, that individual was an FBI

13

agent acting in an undercover capacity (the "UC"). The Victim also provided Weissman, via text message, with an email address being used by the UC that was provided to the Victim by the government (the "UC Email").

29.    On or about April 24, 2018, the Victim spoke with Weissman on a telephone call that was consensually recorded. Weissman informed the Victim that he had met with Tepfer and that Tepfer did not want to meet with the Victim. Weissman further indicated that Tepfer had "information" about the Victim, but that Weissman did not know if he had papers relating to the Victim. Based on agents' conversations with the Victim and the investigation to date, I believe Weissman's statements regarding "information" to be a reference to incriminating evidence about the Victim that Tepfer was claiming to possess.

30.    On or about April 25, 2018, the Victim called Weissman on a telephone call that was consensually recorded. The Victim informed Weissman, in sum, substance and in part, that the Victim's contact in Switzerland needed documents that would be provided to a bank to justify the transfer of $6,000,000.

31.    On or about May 1, 2018, Andrew Tepfer sent a text message to Mark Weissman from the Tepfer Telephone. In that message, Tepfer provided Weissman with the name "Rabbi Chaimoff" and provided the number for the Haimoff Telephone. Tepfer further wrote "He said if he doesn't pick up text him."

32.    On or about May 2, 2018, Tepfer sent a text message to Weissman from the Tepfer Telephone. In that message, Tepfer inquired "Anything happening with Rabbi?" When Weissman indicated "[n]o time today," Tepfer responded "Please soon as possible[.]

He is waiting for your call!" On the same date, toll records reflect two calls between the Haimoff Telephone and the Weissman Telephone.

33.  On or about May 3, 2018, toll records reflect an additional call between the Haimoff Telephone and the Weissman Telephone.

34.  On or about May 4, 2018, toll records reflect three calls between the SUBJECT TELEPHONES.

35.  On or about May 6, 2018, Tepfer and Haimoff exchanged text messages on the SUBJECT TELEPHONES.  Tepfer texted "Rabbi Havemeeting [sic] with Weissman tomorrow Regarding deal." Haimoff responded "My dear avi! I didn't want to tell you but what you told me that you were ready to give to the yeshiva was very not in place and you not aware of the risks that are involve I'm doing what is very fair to do I'm not here to make money of [sic] you every dollar will go to the yeshiva I will."[8]  Based on my training and experience and the investigation to date, I believe that Haimoff was reminding Tepfer of the risk that Haimoff was taking ("you are not aware of the risks that are involve") by taking part in this extortionate scheme.

36.  On or about May 7, 2018, Tepfer sent and received text messages to and from Weissman from the Tepfer Telephone.  In the messages, Tepfer wrote: "I think it should be in hebrew?  Not legal document.  Rabbi Chaimoff can write it[.]"  Weissman responded "Need to send legal document to contact abroad" to which Tepfer responded "You sign it[.]"

---

[8]  .  The "screen shot" image captured by the agents appears to cut off the remainder of the this message.

15

Based on my knowledge of the investigation, I believe Tepfer and Weissman were communicating about the document ("legal document") that needed to be drafted so that an overseas bank would release they money they were attempting to extort from the Victim ("need to send legal document to contact abroad.")

37.     On or about May 7, 2018, toll records reflect a call between the Haimoff Telephone and the Weissman Telephone.

38.     On or about and between May 8, 2018, Weissman and the Victim exchanged the following text messages:

| MW: | It looks like Avi worked out a deal with Rabbi Ygal Haimoff. What is the next step? Thanks |
| --- | --- |
| Victim: | ok . . . [UC] didn't get any email yet |
| MW: | No. I was waiting for Avi to sign General Release. |
| Victim: | ok |

39.     On or about May 8, 2018, Tepfer and Weissman exchanged the following text messages. Tepfer wrote and received the messages on Tepfer Telephone.  Weissman wrote "You will need to sign General Release" to which Tepfer responded "You sign." Weissman then responded "That won't work. Not legally valid."  Based on my training and experience and my knowledge of the investigation, I believe that Weissman was claiming that if he attempted to sign a proposed release of claims (the "General Release") on behalf of Tepfer, it would not be valid.

40.     On or about May 9, 2018, Tepfer sent Weissman a text message from the Tepfer Telephone, indicating that "[t]he rabbi is expecting the wire to hit this week."

16

Based on my knowledge of the investigation, I believe Tepfer and Weissman were communicating about the document ("legal document") that needed to be drafted so that an overseas bank would release  they money they were attempting to extort from the Victim ("need to send legal document to contact abroad.")

37.     On or about May 7, 2018, toll records reflect a call between the Haimoff Telephone and the Weissman Telephone.

38.     On or about and between May 8, 2018, Weissman and the Victim exchanged the following text messages:

| | |
|---|---|
| MW: | It looks like Avi worked out a deal with Rabbi Ygal Haimoff. What is the next step? Thanks |
| Victim: | ok . . . [UC] didn't get any email yet |
| MW: | No. I was waiting for Avi to sign General Release. |
| Victim: | ok |

39.     On or about May 8, 2018, Tepfer and Weissman exchanged the following text messages. Tepfer wrote and received the messages on Tepfer Telephone. Weissman wrote "You will need to sign General Release" to which Tepfer responded "You sign." Weissman then responded "That won't work. Not legally valid." Based on my training and experience and my knowledge of the investigation, I believe that Weissman was claiming that if he attempted to sign a proposed release of claims (the "General Release") on behalf of Tepfer, it would not be valid.

40.     On or about May 9, 2018, Tepfer sent Weissman a text message from the Tepfer Telephone, indicating that "[t]he rabbi is expecting the wire to hit this week."

16

Weissman responded "Not happening this week." Based on my training and experience

knowledge of the investigation, I believe the "wire" refers to the funds that Tepfer,

Weissman and Haimoff were expecting to receive from the Victim from an overseas account

in connection with the extortion. On the same date, toll records reflect two brief telephone

calls between the Haimoff Telephone and the Weissman Telephone.

41.    On or about May 11, 2018 at 6:32 a.m., Weissman sent a text message to

Tepfer on the Tepfer Telephone. The message stated: "The agreement have to be between

them two not with me[.] i can sign a paper that I got loan from the person in Switzerland and

I'll pay back here   Text from Rabbi Haimoff." At 1:15 p.m. on May 11, 2018, Tepfer

responded from the Tepfer Telephone, stating "? The rabbi will sign." Based on my training

and experience and my knowledge of the investigation, I believe Weissman was forwarding

Tepfer a message indicating that Haimoff was prepared to sign documentation ("i can sign a

paper that I got loan from the person in Switzerland") to obtain funds from abroad and then

transfer the money to Tepfer's designee ("I'll pay back here.")

42.    On or about May 11, 2018, the Victim and Weissman met at a location in

Queens, New York. A consensual audio and video recording was made of the meeting. At

the meeting, Weissman indicated that Tepfer was "very paranoid" about the transaction and

asked the Victim if it would be acceptable for Tepfer to sign an agreement that would be kept

by Haimoff. Weissman further indicated that Tepfer was seeking $6,000,000. During the

May 11, 2018 meeting, Weissman and the Victim had the following exchange:

> Victim:        I don't need a release. I need the rabbi to tell me
>                that he has the documents.

17

| MW: | If there are documents. You're assuming there are documents. He never confirmed that there were documents. All I know – |
| --- | --- |
| Victim: | So why am I doing this? |
| MW: | He says he has information. That's what he has. I don't know what documents. I mean, I mentioned documents. All you have to tell [Victim] is that I have the information. |

. . .

| Victim: | I got to get this out of my life ... |
| --- | --- |
| MW: | Listen, I told Avi, I'm tired of this. I'm spending too much time. I want to get, I want you [Tepfer] to make a contribution to my tzedakah fund. So he's going to make a contribution to my tzedakah fund.[9] |
| Victim: | So Avi, when he gets the money, is going to contribute? |
| MW: | Yes. |

43.    During the same meeting on May 11, 2018, the Victim observed Mark Weissman call Igal Haimoff. Haimoff agreed to come to the location in Queens to meet with the Victim and Weissman. Haimoff arrived a short while later.

44.    At the May 11, 2018 meeting between Weissman, Haimoff and the Victim, the Victim informed Haimoff that the Victim needed someone "to hold the papers, that stuff that he [Tepfer] has, that he [Tepfer] says he has against me" and that any such papers be destroyed "once I finish paying him [Tepfer] off." The Victim further stated that he

---

9    "Ttzedakah" is a Hebrew word commonly translated as "charity."

understood that Tepfer had rejected installment payments and that he understood that Tepfer was seeking a single large payment. The Victim further proposed an initial $50,000 "test transaction," with an agreement to send the remaining balance of the $6,000,000 two weeks after the initial transaction.

45.     At the same meeting, Haimoff explained that he would need to explain to his bank why he was receiving the funds. The Victim suggested that Haimoff provide a letter that stated that the UC was going to make a donation to a charity associated with Haimoff. Weismann noted that the letter could be the same as the type that Haimoff would send for an "$18 donation." Haimoff further indicated that he would obtain Tepfer's signature on a document and that he would not provide any money to Tepfer without that signature. Haimoff further requested an initial payment of $200,000 and indicated that he would call Tepfer and manage the funds for Tepfer. Weissman also confirmed that he would prepare the "donation" letter to be directed to the UC. I am believe, based on law enforcement agents' conversations with the Victim and the investigation to date, that Haimoff's reference to obtaining a signature from Tepfer reflected Haimoff's effort to ensure that, prior to any payment of funds, Tepfer would commit not to provide damaging information about the Victim to law enforcement authorities.

46.     Near the conclusion of the May 11, 2018 meeting, Haimoff, Weissman and the Victim had the following exchange:

|   |   |
|---|---|
| Victim: | I'm relying on you. |
| IH: | You can rely on me. Don't worry. |
|   | . . . |

19

| Victim: | I just have the fear that if you give him the $6 million in the first month, he's going to blow through that money. |
| IH: | He's not going to get it. I'm dealing with it. |
| Victim: | Okay |
| MW: | Let him deal with me. |
| Victim: | Alright, make sure that you get the papers from him, make sure that you get everything, |
| IH: | Okay. |

47.     On or about May 14, 2018, Tepfer sent a text message from the Tepfer Telephone to the Haimoff Telephone stating, in part: "Just got off phone with Weissman he told me about meeting Friday. Its, [sic] important that Weissman prepares document soon as possible so we can receive funds [. . .]" Haimoff replied from the Haimoff Telephone writing, "I told them the most import for me now is your shalom hais so they have to act fast as possible." Later that evening, Tepfer responded with a text message writing, "Rabbi We Good?" Haimoff answered "I spoke to Wiseman you have to call me." Toll records reflect: (1) a call between the Haimoff Telephone and the Weissman Telephone, and (2) three between the Tepfer Telephone and the Weissman Telephone on May 14, 2018.

48.     On or about May 17, 2018, Tepfer sent a text message to Weissman from the Tepfer Telephone stating, in part, "Rabbi said he emailed you the letter." Weissman responded "Okay." Later that day, Tepfer again texted Weissman from the Tepfer Telephone, writing "Did you get the email?" Weissman responded "Yes. It was a picture of

the letter. I told Rabbi Haimoff that I need original.  He will give it to you and you can drop off in my office."

49.    On or about May 18, 2018, Tepfer texted Weissman from the Tepfer Telephone, stating "Letter is on your desk!"  Based on my training and experience and my knowledge of the investigation, I believe that in the communications set forth in paragraphs 48 and 49, Tepfer and Weissman were referring to the "letter" described below, which fraudulently claimed that the extorted funds were, in fact, a charitable donation.

50.    On or about May 19, 2018, law enforcement agents initiated a $20,000 transfer from a law enforcement-controlled offshore account to the Charity.  The funds were sent to the bank account identified in the letter emailed to the UC Email on or about May 22, 2018.

51.    On or about May 22, 2018, Weissman and the Victim exchanged text messages.  Weissman indicated that he had attempted to send an email to the UC Email and that it had bounced back.  The Victim provided the email address again and Weissman confirmed that he had sent the prior email to an incorrect address.

52.    Shortly thereafter, on or about May 22, 2018, Weissman sent an email to the UC Email that stated: "Attached please find a letter from the [Charitable Organization associated with Igal Haimoff (the "Charity")] acknowledging your very generous pledge to their building campaign and providing you with wiring instructions.  Please wire the funds as soon as possible and email me confirmation of same. Thank you."  Attached to the email was a letter on the Charity's letterhead from Haimoff.  The letter was addressed to the UC, whose name the Victim had provided to Weissman, and stated:

21

Thank you so much for your pledge of $6,000,000 towards our building campaign. Your generous donation will enable us to complete the construction of our Yeshiva building which is so vital for the continued growth of our Queens community. It is the generosity of donors such as yourself that provide us with the strength and ability to continue being there for the community. Thank you for being our partner in this most important endeavor. For your convenience, you can wire the funds to our bank account as follows [bank account details].

53.     On or about May 23, 2018, the Victim placed a consensually recorded telephone call to Weissman and informed him that the funds would be sent in two transactions. Weissman told the Victim that he would inform Haimoff.

54.     On or about May 23, 2018, Tepfer sent a text message to Weissman from the Tepfer Telephone. Tepfer wrote "Call me need to know when wire will hit and Rabbi should sign something." Based on my training and experience the investigation to date, I believe that the letter addressed to the UC was the previously discussed letter that was designed to disguise the true nature of the extorted funds that Tepfer, Haimoff and Weissman were seeking.  Further, I believe that the word "wire" was a reference to the extorted funds that Tepfer expected to receive from the Victim and that the word "Rabbi" refered to Haimoff.

55.     On or about May 24 and May 25, 2018, Andrew Tepfer sent and received messages to and from Weissman from the Tepfer Telephone. On May 24, 2018, Weissman wrote "Waiting for confirmation from [Victim's first name] that funds are ready to be wired. Need to prepare agreement for Rabbi." The following day, Tepfer wrote "Spoke with Rabbi. He is expecting wire Monday! Don't disappoint him!" When Weissman responded that "Monday is a holiday," Tepfer responded "Not in Switzerland." Based on my training and experience and the investigation to date, I believe that this exchange refers to Haimoff's

22

("Rabbi") expectation that the Victim's money would be wired from overseas ("Switzerland") by Monday, May 28, 2018.

56.     On or about May 24, 2018, the Victim met with Haimoff at Haimoff's residence in Queens, New York. This meeting was consensually audio and video recorded. The Victim advised Haimoff that the funds that Tepfer was seeking from him were the proceeds of a previous fraud. The Victim sought, and received, Haimoff's assurance that Tepfer would not seek more funds. Haimoff further assured the Victim that Haimoff was not going to let Tepfer behave unwisely ("I have to control him.").

57.     On or about May 25, 2018, the Victim exchanged text messages with Mark Weissman. The exchange contained the following communications:

| | |
|---|---|
| Victim: | [P]lease let me know when test wire hits the account all good so we can send balance and end this . . . |
| MW: | When is it supposed to be wired? |
| Victim: | today it left [foreign] bank [I'm] screwed if Rabbi can't handle Avi. I'm looking [losing] all my leverage need to have faith in this rabbi. again let me know when it hits the account and were all good. please check the account . . . |
| MW: | I will follow up with Rabbi. |
| | . . . |
| Victim: | Please be in touch with Rabbi he got stop Avi from screwing me over |
| MW: | I won't let Avi screw you. |

23

Based on my training and experience and the investigation to date, I believe the Weissman was reassuring the Victim that Tepfer would not go to the authorities if the funds were received ("I Won't let Avi screw you.")

58.     On or about and between May 29 and May 31, 2018, Weissman and the Victim had the following text message exchange:

MW:        I don't feel comfortable with your deal.

Victim:    what? well wire left from [foreign] bank.

MW:        How much?

Victim:    $20,000 test wire from [off-shore company.] please confirm you got. once you confirm wire is good it went thru with no issues. Will then start process to send balance.

MW:        I don't want to be involved with this matter. Please reach out to Rabbi Haimoff.

Victim:    ok I will call rabbi.

Based on my training and experience and the investigation to date, I believe the Weissman and the Victim were discussing the amount of the initial extortionate payment ("$20,000 test wire") and Weissman's growing discomfort with the arrangement ("I don't want to be involved with this matter.")

59.     On or about May 31, 2018, the Victim placed a consensually recorded telephone call to Haimoff to inquire if the wire transfer had been received. Haimoff indicated that it had not been received. The Victim informed Haimoff that a $20,000 wire had been sent on May 29, 2018 and provided Haimoff with the name of the sender.

24

60.     On or about May 31, 2018, Weissman sent a text message to Tepfer on the Tepfer Telephone, stating "I asked the Rabbi to reach out to [the Victim.]"

61.     On or about May 31, 2018, Haimoff and Tepfer exchanged text messages on the SUBJECT TELEPHONES. Tepfer wrote: "Maybe we can 7" to which Haimoff responded "I don't understand." Tepfer then wrote "7 million?" to which Haimoff replied "Are you o.k.? that's why everyone don't want to deal with you no body trusting you you agreed on a number and now you want to change it." Tepfer responded "No problem." Later that day, Tepfer texted "If the Rav meets with [Victim's first name], please do not mention my name!!! Good chance he will be wearing a wire !!!!" Thank you." Based on the investigation to date, I believe that Tepfer was inquiring about extorting more money from the Victim ("7 million") and that Haimoff was expressing frustration at the change of plans ("that's why everyone don't want to deal with you"). Subsequently, I believe that Tepfer was warning Haimoff to be cautious if he met with the Victim as the Victim might be cooperating with law enforcement ("Good chance he will be wearing a wire!").

62.     On or about June 4, 2018, the Victim observed Andrew Tepfer on the steps of a location associated with Igal Haimoff's Charity. In additions, toll records show a call between the SUBJECT TELEPHONES on that date.

63.     On or about June 5, 2018, the Victim received a call from Haimoff asking the Victim to meet at a location in Queens, New York. Subsequently, the Victim met with Haimoff at that location. The meeting was consensually audio and video recorded. At that meeting, Haimoff informed the Victim that he had met with Tepfer at a location associated

with Haimoff's Charity. Haimoff informed the Victim that he was dealing with Tepfer directly because Weissman was "afraid" and was now "out of the deal."

64.     Haimoff also informed the Victim that he (Haimoff) had informed Tepfer about the $20,000 transfer, but that Tepfer would not get any money until Haimoff had the "papers" and signed a letter indicating that Tepfer no longer had a claim against the Victim. Haimoff also indicated that he had shown proof of the wire transfer to Tepfer on Haimoff's telephone. Haimoff stated that Tepfer would not go to "the District Attorney." When the Victim indicated that Tepfer could not go to the "FBI" either, Haimoff responded that Tepfer "is not going anywhere." Based on law enforcement agents' conversations with the Victim and my knowledge of the investigation to date, I understand this conversation to be Haimoff reassuring the Victim that Tepfer would not receive any funds until Haimoff was in possession of any purported incriminating documents relating to the Victim and a signed letter in which Tepfer renounced any claims against the Victim.

65.     During the same conversation, Haimoff informed the Victim that he would show the Victim the document that Tepfer was going to sign. Haimoff further indicated that he (Haimoff) would hold the transferred money and that he would have to "find names to give it to." Haimoff further indicated that Tepfer was seeking $7,000,000 instead of $6,000,000. After the Victim indicated that he could provide these funds, but that there could not be a continued escalation of amount of money demanded, Haimoff agreed that he would ensure that Tepfer did not seek more funds.

66.     Additionally, Igal Haimoff and the Victim also discussed potential further communication from the UC Email. Specifically, Haimoff noted that he had already sent a

"letter through Weissman" to the Victim's purported representative in Europe. Haimoff

requested that the Victim's purported representative provide him with a letter indicating why

the representative was making the alleged donation to the Charity and increasing the

"donation" to $7,000,000 from the previously agreed-upon $6,000,000 "donation." In

connection with this request, Haimoff provided an email address to the Victim.

    67.    On or about June 6, 2018, Haimoff and the UC, using the UC Email,

exchanged the following emails:

> UC:    Dear Rabbi Haimoff, I have learned that there is additional structural work required for the construction of the Yeshiva building for the Charity. As such I would like to increase my pledge from $6,000,000 to $7,000,000 to assist you with the project. Please email me a new letter indicating your receipt of the $20,000 that I have previously sent and acknowledgement of my pledge of an additional $6,980,000. Kind regards, [UC].

> IH:    Dear [UC]!! Thank you very much for your chesed that you doing with our yeshiva because of your good heart open hart for mitzvahs we will be able to expand our bldg to the maximum capacity now we don't have any more space for new kid's to come after the construction will be done we will be able to double the amount of children!! until now we got from you 20.000$ we expecting 6.9800.000$ from you to come soon bh thank you so much. Rabbi haimoff.

Based on my training and experience and the investigation to date, I believe that Haimoff's email

reflected an effort to provide a fraudulent explanation for the additional $1,000,000 in

extortionate money that he and Tepfer sought from the Victim.

68.     On June 6, 2018, toll records reflect three calls between the SUBJECT
TELEPHONES.

69.     On or about June 7, 2018, the Victim placed a consensually recorded call to
Haimoff. During that call, Haimoff confirmed that Tepfer had signed a document
confirming that Tepfer would not make additional claims against the Victim and that
Haimoff had the document in his safe.

70.     On or about June 8, 2018, Tepfer sent a text message from the Tepfer
Telephone to the Haimoff Telephone. He wrote: "Hi Rabbi Chaimoff Just checking any
progress with [Victim] And my family Thanks you." Based on my training and experience
and the investigation to date, I believe Tepfer was inquiring about the status of the wire
transfer from the Victim.

71.     On June 18, 2018, federal agents from the FBI and the Internal Revenue
Service, Criminal Investigations, arrested Weissman at his residence. Weissman was advised
of his constitutional <u>Miranda</u> rights by the agents. Weissman indicated that he understood
those rights, was prepared to waive them and agreed to speak to the agents. Weissman stated
in sum, substance and in part, that he had agreed to contact the Victim at the request of
Tepfer. Weissman further indicated that he is an attorney, but that he did not have an
attorney-client relationship with Tepfer. Additionally, he stated that when communicating
with the Victim on behalf of Tepfer, he (Weissman) was not acting as a legal representative
for Tepfer. Weissman further stated that he understood Tepfer was seeking funds from the
Victim and that Tepfer purported to have information that would cause legal problems for the
Victim if it was provided to law enforcement agents. Weissman also indicated that when he

28

made representations to the Victim about his (Weissman's) communications with Tepfer, those representations accurately represented the content of his communications with Tepfer.

72.    On June 18, 2018, federal agents from the FBI arrested Haimoff at his residence. Haimoff was advised of his constitutional <u>Miranda</u> rights by the agents. Haimoff indicated that he understood those rights, was prepared to waive them, signed a written waiver of those rights and agreed to speak to the agents. Haimoff stated in sum, substance and in part, that he had been approached, initially by an intermediary on behalf of Tepfer and then by Tepfer directly, and that Tepfer told Haimoff that Tepfer believed he (Tepfer) was owed money by the Victim from a fraudulent scheme. Haimoff further stated he understood that Tepfer was seeking to extort the Victim and that he (Haimoff) had learned about the extortion from both Tepfer and the Victim. Haimoff also confirmed that he had received $20,000 into a bank account he controlled. Haimoff further claimed that he believed that Tepfer was not going to receive any of the funds from the Victim, but rather the funds would remain with the Charity.

73.    The SUBJECT TELEPHONES are currently in the lawful possession of the FBI. As noted above, the Tepfer Telephone was seized by law enforcement agents in Tepfer's bedroom incident to his arrest on June 18, 2018. The Haimoff Telephone was consensually provided to law enforcement agents by Haimoff and seized incident to his arrest on June 18, 2018.

74.    The SUBJECT TELEPHONES are currently in the possession of the undersigned in the Eastern District of New York. Prior to today's date, the SUBJECT TELEPHONES have been stored at the FBI's office at 26 Federal Plaza, New York. In my training and experience

29

and based on my personal knowledge of this investigation, I know that the SUBJECT TELEPHONES have been stored in a manner in which its contents are in substantially the same state as they were when the SUBJECT TELEPHONES first came into the possession of the FBI.

## TECHNICAL TERMS

75.    Based on my training and experience, I use the following technical terms to convey the following meanings:

a.  Wireless telephone:  A wireless telephone (or mobile telephone, or cellular telephone) is a handheld wireless device used for voice and data communication through radio signals.  These telephones send signals through networks of transmitter/receivers, enabling communication with other wireless telephones or traditional "land line" telephones.  A wireless telephone usually contains a "call log," which records the telephone number, date, and time of calls made to and from the phone.  In addition to enabling voice communications, wireless telephones offer a broad range of capabilities.  These capabilities include: storing names and phone numbers in electronic "address books;" sending, receiving, and storing text messages and e-mail; taking, sending, receiving, and storing still photographs and moving video; storing and playing back audio files; storing dates, appointments, and other information on personal calendars; and accessing and downloading information from the Internet.  Wireless telephones may also include global positioning system ("GPS") technology for determining the location of the device.

b. Digital camera: A digital camera is a camera that records pictures as digital picture files, rather than by using photographic film. Digital cameras use a variety of fixed and removable storage media to store their recorded images. Images can usually be retrieved by connecting the camera to a computer or by connecting the removable storage medium to a separate reader. Removable storage media include various types of flash memory cards or miniature hard drives. Most digital cameras also include a screen for viewing the stored images. This storage media can contain any digital data, including data unrelated to photographs or videos.

c. GPS: A GPS navigation device uses the Global Positioning System to display its current location. It often contains records the locations where it has been. Some GPS navigation devices can give a user driving or walking directions to another location. These devices can contain records of the addresses or locations involved in such navigation. The Global Positioning System (generally abbreviated "GPS") consists of 24 NAVSTAR satellites orbiting the Earth. Each satellite contains an extremely accurate clock. Each satellite repeatedly transmits by radio a mathematical representation of the current time, combined with a special sequence of numbers. These signals are sent by radio, using specifications that are publicly available. A GPS antenna on Earth can receive those signals. When a GPS antenna receives signals from at least four satellites, a computer connected to that antenna can mathematically calculate the antenna's latitude, longitude, and sometimes altitude with a high level of precision.

d.  PDA: A personal digital assistant, or PDA, is a handheld electronic device used for storing data (such as names, addresses, appointments or notes) and utilizing computer programs. Some PDAs also function as wireless communication devices and are used to access the Internet and send and receive e-mail. PDAs usually include a memory card or other removable storage media for storing data and a keyboard and/or touch screen for entering data. Removable storage media include various types of flash memory cards or miniature hard drives. This removable storage media can store any digital data. Most PDAs run computer software, giving them many of the same capabilities as personal computers. For example, PDA users can work with word-processing documents, spreadsheets, and presentations. PDAs may also include global positioning system ("GPS") technology for determining the location of the device.

e.  IP Address: An Internet Protocol address (or simply "IP address") is a unique numeric address used by computers on the Internet. An IP address is a series of four numbers, each in the range 0-255, separated by periods (e.g., 121.56.97.178). Every computer attached to the Internet computer must be assigned an IP address so that Internet traffic sent from and directed to that computer may be directed properly from its source to its destination. Most Internet service providers control a range of IP addresses. Some computers have static—that is, long-term—IP addresses, while other computers have dynamic—that is, frequently changed—IP addresses.

f.   Internet: The Internet is a global network of computers and other electronic devices that communicate with each other. Due to the structure of the Internet, connections between devices on the Internet often cross state and international borders, even when the devices communicating with each other are in the same state.

76.   Based on my training, experience, and research, I know that, among other things, the SUBJECT TELEPHONES has capabilities that allow it to serve as wireless telephones, digital cameras, GPS navigation devices and PDAs. In my training and experience, examining data stored on devices of this type can uncover, among other things, evidence that reveals or suggests who possessed or used the device.

## ELECTRONIC STORAGE AND FORENSIC ANALYSIS

77.   Based on my knowledge, training, and experience, I know that electronic devices can store information for long periods of time. Similarly, things that have been viewed via the Internet are typically stored for some period of time on the device. This information can sometimes be recovered with forensics tools.

78.   *Forensic evidence.* As further described in Attachment B, this application seeks permission to locate not only electronically stored information that might serve as direct evidence of the crimes described on the warrants, but also forensic evidence that establishes how the SUBJECT TELEPHONES were used, the purpose of their use, who used them, and when. There is probable cause to believe that this forensic electronic evidence might be on the SUBJECT TELEPHONES because:

33

g. Data on the storage medium can provide evidence of a file that was once on the storage medium but has since been deleted or edited, or of a deleted portion of a file (such as a paragraph that has been deleted from a word processing file).

h. Forensic evidence on a device can also indicate who has used or controlled the device. This "user attribution" evidence is analogous to the search for "indicia of occupancy" while executing a search warrant at a residence.

i. A person with appropriate familiarity with how an electronic device works may, after examining this forensic evidence in its proper context, be able to draw conclusions about how electronic devices were used, the purpose of their use, who used them, and when.

j. The process of identifying the exact electronically stored information on a storage medium that are necessary to draw an accurate conclusion is a dynamic process. Electronic evidence is not always data that can be merely reviewed by a review team and passed along to investigators. Whether data stored on a computer is evidence may depend on other information stored on the computer and the application of knowledge about how a computer behaves. Therefore, contextual information necessary to understand other evidence also falls within the scope of the warrant.

k. Further, in finding evidence of how a device was used, the purpose of its use, who used it, and when, sometimes it is necessary to establish that a particular thing is not present on a storage medium.

34

79.    *Nature of examination.*  Based on the foregoing, and consistent with Rule 41(e)(2)(B), the warrant I am applying for would permit the examination of the device consistent with the warrant.  The examination may require authorities to employ techniques, including but not limited to computer-assisted scans of the entire medium, that might expose many parts of the device to human inspection in order to determine whether it is evidence described by the warrant.

80.    *Manner of execution.*  Because these warrants seek only permission to examine devices already in law enforcement's possession, the execution of these warrants does not involve the physical intrusion onto a premises.  Consequently, I submit there is reasonable cause for the Court to authorize execution of the warrants at any time in the day or night.

## CONCLUSION

81.    I submit that this affidavit supports probable cause for search warrants authorizing the examination of the SUBJECT TELEPHONES described in Attachment A-1 and Attachment A-2 to seek the items described in Attachment B.

Respectfully submitted,

NICHOLAS SWANSON
Special Agent
Federal Bureau of Investigation

Subscribed and sworn to before me
on July 9, 2018:

The Hon. Ramon E. Reyes, Jr.
UNITED STATES MAGISTRATE JUDGE

35

## ATTACHMENT A-1

1.      The property to be searched is a silver Samsung cellular telephone, assigned

telephone number (917) 651-5016 (together with the telephone identified in Attachment A-2, the

"SUBJECT TELEPHONES"). The SUBJECT TELEPHONES are currently located in

Brooklyn, New York.

This warrant authorizes the forensic examination of the SUBJECT

TELEPHONES for the purpose of identifying the electronically stored information described in

Attachment B.

## ATTACHMENT A-2

1.      The property to be searched is a grey and black Samsung model S8 cellular

telephone, with IMEI #358331082177459, assigned telephone number (718) 312-9358; (together

with the telephone identified in Attachment A-1, the "SUBJECT TELEPHONES"). The

SUBJECT TELEPHONES are currently located in Brooklyn, New York.

        This warrant authorizes the forensic examination of the SUBJECT

TELEPHONES for the purpose of identifying the electronically stored information described in

Attachment B.

## ATTACHMENT B

1.      All records on the SUBJECT TELEPHONES described in Attachments A-1 and

A-2 that relate to violations of 18 U.S.C. §§ 873 (blackmail); 1512 (obstruction of justice); 1956

(money laundering); 1957 (money laundering conspiracy) and 1952 (barring use of interstate

facilities to engage in extortion in violation of New York State Penal law) and involve Igal

Haimoff, Andrew Tepfer and Mark Weissman since February 15, 2017, including:

     a.   Wiring instructions relating to funds to be extorted;

     b.   Communications and/or fraudulent documents relating to the "legitimate" reason

       that would be provided to financial institutions or other entities relating to the

       wiring of large sums of funds;

     c.   Information relating to the amount of funds to be extorted and/or the manner,

       date, place and specific amounts in which sums were to be paid;

     d.   Any information regarding (or related to) purportedly derogatory information

       about the Victim and threats to provide such information to the legal authorities;

     e.   Any information relating efforts to disguise the source of the extorted funds or the

       beneficial owner of recipient of such funds; and

     f.   all bank records, checks, credit card bills, account information, and other financial

       records.

2

2.      Evidence of user attribution showing who used or owned the SUBJECT TELEPHONES at the time the things described in this warrant were created, edited, or deleted, such as logs, phonebooks, saved usernames and passwords, documents, and browsing history;

As used above, the terms "records" and "information" include all of the foregoing items of evidence in whatever form and by whatever means they may have been created or stored, including any form of computer or electronic storage (such as flash memory or other media that can store data) and any photographic form.